UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

CARLOS P. AGUINAGA, MARIA CHRISTINA
AGUINAGA & D.A.S. TRADING, INC.,

                                    Plaintiffs,

           -against-

UBS AG & UBS (BAHAMAS) LTD.,

                                   Defendants.

------------------------------------------------------------

09 Civ. 03261 (RJH)

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

       Before the Court is defendants' UBS AG ("UBS") and UBS (Bahamas) Ltd.

("UBS Bahamas") (collectively the "UBS defendants") motion to dismiss **[37]** pursuant

to Federal Rules of Civil Procedure 17(a) and 19, and pursuant to certain forum selection

clauses.  In 2006, Global Management Enterprises, Ltd. ("Global") opened an account

with UBS Bahamas.  D.A.S. Trading, Inc. ("DAS") was the investment manager for that

account.  In 2009, DAS signed a collateral security agreement ("CSA") with UBS

Bahamas pledging certain property owned by its sole shareholder Carlos P. Aguinaga as

collateral for a loan Global owed to UBS Bahamas (the "Global loan").  Plaintiffs allege

that UBS Bahamas undertook unauthorized transactions regarding, and applied certain

unauthorized fees and expenses to, the Global loan, unlawfully increasing the balance

Global owed on that loan.  The UBS defendants contend that Global, who is not party to

this litigation, is the real party in interest; that Global is an indispensable but diversity-

spoiling party; and that The Bahamas is the exclusive forum for any litigation arising out

of the Global loan.  For the reasons stated below, the Court finds that Global is the real

party in interest for plaintiffs' second, third, fourth, and fifth claims; but that plaintiffs are the real parties in interest for their first claim; that Global is not a required party under Rule 19(a) for plaintiffs' first claim; and that The Bahamas is not the exclusive forum for plaintiffs' first claim.  The Court therefore GRANTS in part and DENIES in part the UBS defendants' motion.

## I.  BACKGROUND

The following facts are taken from the second amended complaint ("SAC") and the relevant submissions of the parties.[1]  These facts are taken as true for the purposes of the present motion.

### A.  The Parties

The plaintiffs in this case are Carlos P. Aguinaga ("Aguinaga"), Maria Christina Aguinaga (collectively the "Aguinagas"), and DAS.  The Aguinagas are citizens of Brazil and New York.  (SAC ¶ 1.)   Aguinaga is also the sole shareholder of DAS.  (*Id*. ¶ 11.) DAS is a Delaware corporation with its principal place of business in New York.  (*Id*. ¶ 4.)  DAS is an investment management company and managed a portfolio owned by Global and held by UBS Bahamas.  (*Id*. ¶¶ 12-13.)  That portfolio consisted primarily of shares of a company called Ideiasnet, S.A. ("Ideiasnet").  (*Id*. ¶ 14.)

Defendants are UBS and UBS Bahamas.  UBS is a Swiss corporation with its principal place of business in Switzerland and offices in New York.  (*Id*. ¶ 5.)  UBS

---

[1] "It is well established that when the question is subject matter jurisdiction, the court is permitted to rely on information beyond the face of the complaint."  *St. Paul Fire & Marine Ins. Co. v. Universal Builders*, 409 F.3d 73, 80 (2d Cir. 2005).

Bahamas, a wholly-owned subsidiary of UBS, is a Swiss corporation with its principal place of business in The Bahamas and that does business in New York.  (*Id*. ¶ 6.)

Several entities involved in plaintiffs' factual allegations are missing from the litigation.  First is Global.  Global is a British Virgin Islands corporation with its principal place of business in the British Virgin Islands.  (*Id*. ¶ 3.)  Global's sole director is another British Virgin Islands company called H.T.M. Services, Ltd. ("HTM").  (Def.'s Mem. at 2.)  Also involved is Ideiasnet.  Ideiasnet is a Brazilian company whose stock trades on BM&F Bovespa, the São Paolo, Brazil, stock exchange.  (*Id*. at 3.)  During the relevant period Aguinaga was the Chairman of the Board of Ideiasnet.  (SAC ¶ 14.)

**B.  DAS Becomes Global's Investment Manager**

On November 15, 2002, DAS and Global executed an "Investment Management Agreement."  (Aguinaga Decl. attach. 1 ("IMA") at 1.)  Pursuant to that agreement, DAS was "for all purposes herein . . . deemed to be an independent contractor and shall except as expressly provided herein have no authority to act for or represent [Global] in any way or otherwise be deemed an agent of [Global]."  (*Id*. § 1.2.)  All assets managed by DAS were "held by [DAS] in [Global's] name."  (*Id*. § 3.)  DAS took an annual fee of one percent of Global's assets calculated on December 15 of each year.  (Aguinaga Decl. attach. 1 at 9.)[2]  DAS would also not be liable, "in the absence of negligence, willful default or fraud on its part . . . for any act or omission in the course of or in connection

---

[2] Attached to the Aguinaga Declaration filed with plaintiffs' opposition papers are nine pages of documents.  Though unlabeled, the first eight make up the IMA.  The last page of the attachment is a separate letter agreement executed between DAS and Global on December 1, 2002.  (Aguinaga Decl. attach. 1 at 9.)  It sets out the fee Global would owe DAS for DAS's services.  Though the letter states: "Ref.: Section 6 of the INVESTMENT MANAGEMENT AGREEMENT," (*Id*.), it clearly refers instead to section five of the IMA.  Section five governs the IMA's "FEES AND EXPENSES," while section six governs "LIMITATION OF LIABILITY."  (IMA §§ 5, 6.)

with the service rendered by it hereunder or for any decline in the price or value of income from any of the assets of [Global]."  (IMA § 6.)

DAS "agree[d] to assume the obligations and responsibilities set forth [in the IMA]." (*Id.* § 1.1).  Those included trading in securities; managing investments and cash; keeping Global's records under review; providing Global with account statements; accounting to Global for income received and rights conferred regarding Global's assets, and for any transaction enacted on Global's behalf; advising Global regarding investment trends; managing Global's bank and brokerage accounts; and borrowing money on behalf of Global and securing those loans with Global's assets.  (*Id.* §§ 2.1(a)-(h), 2.2, 2.3.)  DAS was expressly prohibited, however, from making any withdrawals from any account, or "transact[ing] with related parties." (*Id.* § 2.4(a)-(c).)  The IMA did not expressly provide DAS any right to bring suit on Global's behalf, or any ability to effect Global's litigation rights generally.

**C.  Global Opens an Account with UBS Bahamas**

Global opened an account with UBS Bahamas on August 9, 2006.  (Dexter Decl. Ex. A ("Account Application") at 1.)  In doing so, Global executed several agreements with UBS Bahamas.  The first, UBS Bahamas's "Application for the Opening of an Account," lists Global as the "Account Holder."  (*Id.*)  The application contained several "General Conditions" including one entitled "No trusts" which states:

> Where a client is acting as a trustee or in any other fiduciary capacity or where the rights of the client against the Bank are subject to any encumbrance, equity or third party interest, then, notwithstanding any actual notice of the same to the Bank, the Bank shall be entitled to disregard the same and to treat the client as absolute beneficial and unencumbered owner subject to any written directions from the client to

> the Bank properly made in accordance with these regulations and the
> relevant account opening agreement.  This provision and all other
> provisions of these Conditions and the relevant account opening
> agreement shall be binding upon all third parties claiming an interest in the
> account.

(*Id*. ¶ 11.)  The agreement also allowed UBS Bahamas to adjust interest rates, exchange

rates, and commissions (*Id*. ¶ 13); and required Global to not hold liable and to indemnify

UBS Bahamas for losses, liabilities, and expenses incurred "as a result of the

relationship," other than those incurred through UBS Bahamas's own fraud.  (*Id*. ¶ 14.)

The agreement was governed by the laws of The Bahamas and made The Bahamas the

exclusive forum for all proceedings against UBS Bahamas brought thereunder.  (*Id*. ¶

15.)[3]

      Global and UBS Bahamas also executed a "Letter of Lien and Set-off."  (Dexter

Decl. Ex. B ("LOL") at 1, 4.)  By this agreement, UBS Bahamas was entitled to take a

lien on all securities held in Global's account as security for any loan owed by Global to

UBS Bahamas.  (*Id*. ¶ 1.)  UBS was also entitled to sell those securities and apply the

proceeds to any such loans.  (*Id*. ¶ 8.a.)  The parties also executed a third agreement

entitled "Basic Agreement for Collateral Loans," (Dexter Decl. Ex. C ("CLA") at 1),

setting forth further loan conditions.  Both agreements were governed by the laws of The

Bahamas, and made The Bahamas the exclusive jurisdiction for any suit brought by

Global against UBS Bahamas.  (*Id*. ¶ 11; LOL ¶¶ 17, 18.e.)

      Finally, also on August 9, 2006, Global and DAS executed UBS Bahamas's

standard form "Power of Attorney for Management of Assets" agreement.  (Dexter Decl.

---

[3] The Account Application, as well as every other agreement executed between Global and UBS Bahamas
on August 9, 2006, as part of the opening of Global's account, was signed by HTM as director of Global.
(Account Application at 1; *see also* Dexter Decl. Ex. B at 4; Ex. C at 2; Ex. E. at 2.)  HTM listed several
individuals as its authorized signatories; however that list did not include either DAS or the Aguinagas.
(Dexter Decl. Ex. D.)

Ex. E "Power of Atty Agreement" at 1-2.)  Pursuant to that agreement Global gave DAS

the responsibility of managing all the assets in its UBS Bahamas account, specifically

including the rights to buy and sell securities, perform various investment operations, and

"take all other measures which [DAS] may deem appropriate in connection with the

management of [Global's] assets."  (*Id*. ¶ 1.)  DAS was expressly prohibited, however,

from withdrawing securities, making dispositions in its favor, or effecting payments other

than for executing securities transactions.  (*Id*.)  The agreement was governed by the laws

of The Bahamas, and required Global to submit to the "non-exclusive" jurisdiction of the

courts of The Bahamas.  (*Id*. ¶ 9.)


**D.  UBS Bahamas Extends Global a Loan and Takes Liens on Global's Stock
Portfolio and Aguinaga's Real Property**

In October 2008, UBS Bahamas extended a $9.6 million loan to Global and

created a liability in Global's account for the same amount.  (SAC ¶ 7(c)(ii).)  To secure

that loan, UBS Bahamas executed a lien on the Ideiasnet stock then held in Global's

account.  (*Id*. ¶¶ 12, 14; Def.'s Mem. at 3.)  That loan was presumably subject to the

agreements outlined above, including the LOL's provision allowing UBS to sell stock

held in the Global account and securing Global's debts, and to apply the proceeds of

those sales towards satisfaction of those debts.  (*See* LOL ¶ 8.a.)

By 2009 plaintiffs were apparently worried that UBS Bahamas was going to

liquidate the Ideiasnet stock as the stock's value and the value of the Brazilian real

declined.  (Def.'s Mem. at 3.)  Thus on January 12, 2009, UBS Bahamas, and the

Aguinagas and DAS "as Investment manager for [Global]," executed a Collateral

Security Agreement.  (SAC at 17-19.)  Pursuant to the CSA, UBS Bahamas took a lien worth $7 million on real property owned by the Aguinagas in LaGrangeville and Manhattan, New York.  (*Id*. at 17.)  In return, UBS Bahamas agreed to refrain from selling the Ideiasnet shares in Global's account.  (*Id*. ¶¶ 16, 18-19, 21(a)).  The CSA was governed by New York law and contained a New York forum selection clause.  (*Id*. at 19.)

## E.  This Litigation

Idieasnet, however, continued to fall in value; and in the first week of April 2009 UBS Bahamas sold a total of 211,000 shares of Ideiasnet for $188,600, applying the proceeds to the Global loan.  (*Id*. ¶¶ 24, 34, 36; Def.'s Mem. at 3.)  On April 6, 2009, plaintiffs commenced this litigation seeking to prohibit UBS Bahamas from further sale of the Ideiasnet stock in breach of the CSA.  (SAC ¶¶ 38, 40.)  The Court granted plaintiffs a temporary restraining order on April 6, and a preliminary injunction on April 14, 2009.  (*Id*. ¶ 39; Order of Apr. 14, 2009 (docket no. [15]).)  By October 2009, however, UBS Bahamas learned that Ideiasnet was to be sold in a public tender offer in Brazil and that DAS wanted the Ideiasnet stock subject to UBS Bahamas's lien sold in that tender.  (Def.'s Mem. at 4; Pl.'s Opp'n at 5.)  By mid-November, UBS Bahamas had released all liens it held on the Aguinagas' property in New York, and had moved to vacate the preliminary injunction.  (SAC ¶ 26; Def.'s Mem. at 4.)[4]  Before the Court

---

[4] The UBS defendants contend, as well, that their release of the liens terminated the CSA.  (Def.'s Mem. at 4.)  The CSA states:  "[I]n the event the Property(ties) are no longer needed to provide Collateral for the lien to protect the interest of UBS, . . . [UBS Bahamas will release the liens,] and the terms of this Agreement shall remain in full force and effect until such time as the terms of this Paragraph are met." (SAC at 18.)  Plaintiffs do not address the CSA's termination either in the operative complaint or in their papers opposing the present motion.

could rule on that motion, however, the parties agreed to voluntarily lift the injunction and allow UBS Bahamas to sell the Ideiasnet stock subject to the lien in the Brazil tender offer, applying the proceeds to Global's loan and account.  (SAC ¶ 27.)  UBS Bahamas sold the remaining 7,708,400 shares of Ideiasnet stock on November 30; received $23,692,351.44 in return on December 3; paid off the Global loan with $10,900,351; and transferred to remainder to Global's account.  (*Id*. ¶¶ 28-31.)

Plaintiffs filed their second amended complaint on December 11, 2009.  (*Id*. at 15.)  The complaint states five claims:  First, that UBS Bahamas's April 2009 sales of Ideiasnet violated the CSA and lowered the proceeds eventually received in the November tender offer; and that plaintiffs were damaged by the difference between the April price and the November price for those 211,000 shares.  (*Id*. ¶¶ 32-42.)  Second, that between October 2008 and November 2009 UBS Bahamas engaged in unauthorized currency speculation increasing the balance of the Global loan; and that plaintiffs suffered damages equaling that increase.  (*Id*. ¶¶ 43-69.)  Third, that UBS Bahamas improperly charged certain fees to Global's account; and that plaintiffs were damaged in the amount of those fees.  (*Id*. ¶¶ 70-75.)  Fourth, that UBS Bahamas charged an improperly high interest rate to the Global loan in September, October, and November 2009; and that plaintiffs were damaged thereby.  (*Id*. ¶¶ 76-82.)  And fifth, that UBS Bahamas improperly deducted certain unexplained charges from the amount paid into Global's account after satisfaction of the Global loan; and that plaintiffs were damaged in the amount of those charges.  (*Id*. ¶¶ 88, 92.)

## II.  DISCUSSION

### A.  Legal Standards

#### 1.  Federal Subject Matter Jurisdiction

"'It is a fundamental precept that federal courts are courts of limited jurisdiction' and lack the power to disregard such limits as have been imposed by the Constitution or Congress." *Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009) (quoting *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978)).  Plaintiffs claim diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).  (SAC ¶ 9.)  Section 1332(a)(2) requires that the amount in controversy exceed $75,000, and that the controversy be between "citizens of a State and citizens or subjects of a foreign state."  *CP Solutions PTE, Ltd. v. General Electric Co.*, 553 F.3d 156, 158 (2d Cir. 2009) (quoting 28 U.S.C. § 1332(a)(2)).  Thus when the litigants on one side of an action are foreign, the litigants on the other must be citizens of a State of the United States.  *Creaciones Con Idea, S.A. de C.V. v. MashreqBank PSC*, 75 F. Supp. 2d 279, 283 (S.D.N.Y. 1999).  "Diversity jurisdiction does not exist, however, where on one side there are citizens [of a State] and aliens and on the opposite side there are only aliens."  *CP Solutions*, 553 F.3d at 158 (internal quotation marks omitted, alterations in original).  The parties agree that the UBS defendants and Global are both foreign citizens and that therefore the Court would lack subject matter jurisdiction should Global be made a plaintiff to this action.  (Def.'s Mem. at 6; Pl.'s Opp'n at 13.)

## 2.  Required Joinder of Parties Under Rule 19[5]

Federal Rule of Civil Procedure 19 mandates that district courts join certain

absent parties to a present action, and allows the court to dismiss the action if such parties

cannot be joined and if proceeding without those parties is inequitable.  *Bartfield v.*

*Murphy*, 578 F. Supp. 2d 638, 644 (S.D.N.Y. 2008).  "Rule 19 sets forth a two-step test

for determining whether the court must dismiss an action for failure to join an

indispensable party."  *Greenwich Life Settlements, Inc. v. Viasource Funding Grp. LLC*,

___ F. Supp. 2d ___, 2010 WL 3895481, at *8 (S.D.N.Y. Oct. 4, 2010) (internal

quotation marks omitted).  First the court determines whether the absent party is

"required" under Rule 19(a)(1).  *See id.*  A party is "required" if

> (A) in that person's absence, the court cannot accord complete relief
> among existing parties; or (B) that person claims an interest relating to the
> subject of the action and is so situated that disposing of the action in the
> person's absence may: (i) as a practical matter impair or impede the
> party's ability to protect the interest; or (ii) leave an existing party subject
> to a substantial risk of incurring double, multiple, or otherwise
> inconsistent obligations because of the interest.

*Davidson Well Drilling, Ltd. v. Bristol-Myers Squibb Co.*, No. 09 Civ. 1431 (SAS), 2009

WL 2135396, at *3 (S.D.N.Y. July 16, 2009) (quoting Fed. R. Civ. P. 19(a)(1)).  If a

"required" party cannot be joined, the court must consider "whether, in equity and good

conscience, the action should proceed among the existing parties or should be dismissed"

under Rule 19(b).  *Greenwich Life*, 2010 WL 3895481, at *8 (citing Fed. R. Civ. P.

19(b)).  The factors a court considers in making that determination include

---

[5] Prior to December 1, 2007, the two-step Rule 19 inquiry asked first whether a party was "necessary" and second whether that party was "indispensable," and thus whether its non-joinder required the court to dismiss the case.  The change to the current determinations of first whether a party is "required" and second whether the court must dismiss the action if joinder is not feasible were "intended to be stylistic only." Fed. R. Civ. P. 19 2007 amend.  The Second Circuit has stated, moreover, that "[t]here is no substantive difference between the present rule and the rule . . . prior to the 2007 amendment."  *CP Solutions*, 553 F.3d at 159 n.2 (citing *Republic of Philippines v. Pimentel*, 553 U.S. 851, 856 (2008)).

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing party; (2) the extent to which any prejudice could be lessened or avoided by [ ] protective provisions in the judgment [,] shaping the relief[,] or other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

*Davidson Well Drilling*, 2009 WL 2135396, at *4 (quoting Fed. R. Civ. P. 19(b), alterations in original).  "This determination is an equitable one and is left to a court's discretion."  *Id*. (internal quotation marks omitted).

### 3. Rule 17(a)'s Real Party in Interest Requirement

As a matter of constitutional law, a plaintiff must establish that it has standing to bring suit.  *Energy Transport Ltd. v. M.V. San Sebastian*, 348 F. Supp. 2d 186, 194 (S.D.N.Y. 2004).  Standing requires the plaintiff to prove (1) an "injury in fact," (2) a causal connection between the injury and the conduct complained of, and (3) that the injury would be addressed by a favorable decision.  *Id*. (citing *United States v. Vazquez*, 145 F.3d 74, 80 (2d Cir. 1998)).

Collateral to the constitutional requirements, Federal Rule of Civil Procedure 17(a) requires that every action "be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a).  "Specifically, courts must determine whether a plaintiff's claim is based on the legal rights of a third party, asserts only a generalized grievance, or advances an argument that falls beyond the zone of interests protected by the legal provision invoked."  *Energy Transport*, 348 F. Supp. 2d at 194.  In other words, plaintiff must be "the party who, under the governing substantive law, is entitled to enforce the right at issue; . . . defendant [should be protected] against a subsequent action by the

party actually entitled to recover; . . . [and] the judgment [must] have its proper effect as

res judicata."  *Id*. at 196 (internal quotation marks and citations omitted).  If the real party

in interest is not or cannot be joined, the court may dismiss the action.  6A Charles Alan

Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 1555

(3d ed. 2007).


**B.  Global is the Real Party in Interest for Plaintiffs' Second-Through-Fifth Claims,**
**and Therefore Those Claims are Dismissed**

Though Rule 17(a) neither requires that the entity bringing the action be the entity

who will ultimately recover, nor requires that that entity be necessarily signatory to the

contract, "[only] if the applicable substantive law gives the [plaintiff] an enforceable

right, [will] th[at plaintiff] also [] be a real party in interest and [entitled to] bring an

action on the contract on his own."  6A Wright, et al., *Federal Practice and Procedure* §

1543.  If the real party in interest is not or cannot be joined, the court may dismiss the

action.  *Id*. § 1555.

Plaintiffs label only their first claim as a "Breach of [contract]."  But as plaintiffs'

second, third, fourth, and fifth claims allege breaches by UBS Bahamas of its agreements

with Global, the results of which improperly increased the balance of the Global loan,[6]

those claims sound in breach of contract as well.  To bring such claims under New York

---

[6] Plaintiffs' second claim alleges, "the real reason the balance of the Global Loan increased . . . was due to the cost of currency speculation undertaken by UBS *in the Global Loan account*.  [] UBS was never authorized by DAS or Global to engage in currency speculation . . . . [N]o instrument signed by DAS or Global authorized UBS to engage in currency speculation *at Global's expense*."  (SAC ¶¶ 51-53. (emphasis added)).  The third alleges, "UBS has charged Global with 'fees', totalling [sic] approximately $205,416, many or almost all of which are not items that should be charged to the Global account."  (*Id*. ¶ 71.)  The fourth alleges, "[unexplained] interest charges [were] excessive or not authorized by any instrument executed by plaintiffs or Global."  (*Id*. ¶ 82.)  Finally, the fifth alleges, "There remains approximately $394,612 in deductions from the Global Loan that plaintiff cannot identify."  (*Id*. ¶ 88.)  These claims are titled "Unauthorized Currency Speculation," "Unauthorized and Improper Fees," etc.

law, plaintiffs must prove "(1) formation of a contract between plaintiff[s] and defendants; (2) performance by plaintiff[s]; (3) defendants' failure to perform; and (4) resulting damage." *Wells Fargo Bank Northwest, N.A. v. Sundowner Alexandria, LLC*, No. 09 Cv. 7313 (BSJ), 2010 WL 3238948, at *3 (S.D.N.Y. Aug. 16, 2010) (quoting *Barker v. Time Warner Cable, Inc.*, No. 016438/08, 897 N.Y.S.2d 668, 2009 WL 1957740, at *3 (N.Y. Sup. Ct. 2009)).  Plaintiffs, however, are not signatories to the agreements allegedly breached by UBS Bahamas giving rise to these claims.  In other words, plaintiffs cannot satisfy the first element of a New York breach of contract action, that a contract existed between them and defendants.  Thus plaintiffs, without more, are not the real parties in interest as regards their second, third, fourth, and fifth claims.

　　　　Plaintiffs make several arguments going to their entitlement to pursue this suit. None is persuasive.  First plaintiffs argue "D.A.S. managed the Global account" at UBS Bahamas, (Pl.'s Opp'n at 12); and that the UBS Bahamas recognized DAS's responsibility in "making decisions regarding" that account.  (*Id*. at 6).  Even taking these allegations as true, however, plaintiffs provide no authority, and the Court can find none, saying that an investment manager is entitled, purely because of its responsibilities to its client, to sue on that client's behalf by invoking contractual agreements between the client and a third party.  The Court recognizes that plaintiffs might be attempting to make an agency argument.  However, this would fail as (1) neither the IMA nor the Power of Attorney Agreement executed between Global and DAS grant DAS the right to sue on Global's behalf; (2) the IMA states, in clear terms, "[DAS] shall except as expressly provided herein *have no authority to act for or represent* [Global] *in any way or otherwise be deemed an agent of* [Global]," (IMA § 1.2 (emphasis added)); and (3) even

if DAS *were* Global's agent, an agent of a disclosed principal has rights and duties under, and can enforce, the principal's contract only when "there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal." *United Natural Foods, Inc. v. Burgess*, 488 F. Supp. 2d 384, 390 (S.D.N.Y. 2007) (citing *Lerner v. Amalgamated Clothing and Textile Workers Union*, 938 F.2d 2, 5 (2d Cir. 1991)); *see also John Minder & Son v. L.D. Schreiber Co*, 73 F. Supp. 477, 480 (S.D.N.Y. 1947) (agent can enforce principal's contracts only when the agent "specifically agrees to bind himself personally [to] the contract . . . [and] such intention is manifest or proved."); 12 Williston on Contracts § 35:36 (agent has no rights or duties under his principal's contract "unless there is clear and explicit evidence of the agent's intention to substitute or to add his personal liability for or to that of his principal.").  As DAS was not Global's agent, and as Global's agreements with UBS Bahamas in no way manifest DAS's intention to bind itself to those agreements, plaintiffs' arguments that DAS is the real party in interest sounding in agency law fail.

Next, plaintiffs argue that Aguinaga is the real party in interest because "[his] position as Chairman of Ideiasnet, S.A. depended on Global continuing to own the Ideiasnet shares held in the Global account."  (Pl.'s Opp'n at 13.)  Apparently, plaintiffs' contention is that Aguinaga had an interest in preventing UBS Bahamas from selling the Ideiasnet stock because should UBS Bahamas have liquidated Global's block of Ideiasnet, that company's stock value would have plummeted.  Presumably, if that had happened, Aguinaga's position at Ideiasnet would have been in danger.  Even taking all this as true however, Aguinaga is made a party in interest for plaintiffs' first cause of action only, that for UBS Bahamas's breach of its obligation to refrain from selling the

14

Ideiasnet stock, and not for plaintiffs' causes of action based on UBS Bahamas improper charging of fees and expenses to the Global account.  Therefore, Aguinaga's position as Ideiasnet's chairman does not make him a real party in interest for plaintiffs' second-through-fifth claims.

Plaintiffs' final argument is that DAS is a real party in interest because "D.A.S. was compensated on the basis of the value of the assets it managed for Global."  (*Id*. at 12.)  This argument apparently refers to DAS's agreement with Global by which DAS would take as a fee for managing Global's investments, "one per cent per annum[] of the total [Global] assets."  (Aguinaga Decl. attach. 1 at 9.)  Though unclear, plaintiffs seem to be arguing that DAS was an intended third-party beneficiary of the account agreements executed between Global and UBS Bahamas.

Under New York law, an entity may claim rights as a third-party beneficiary under a contract it has not signed when (1) there exists a valid contract between other parties; (2) the contract was intended for the non-party's benefit; and (3) the benefit to the non-party is immediate, and not incidental, so that the contracting parties had assumed a duty to compensate him if the benefit is lost.  *Mayo v. County of Albany*, 357 Fed. Appx. 339, 343 (2d Cir. 2009).  Plaintiffs' claims as third-party beneficiaries fail.  First, the account agreements do not reference DAS in any way except to grant, in the Power of Attorney Agreement, DAS the power to "manage all assets deposited . . . [in Global's] account with UBS (Bahamas) Ltd."  (Dexter Decl. Ex. E ¶ 1.)  In other words, nothing in the agreements evidences any intent that DAS or the Aguinagas should benefit from Global's opening an account with UBS Bahamas.  Second, any benefit to DAS, namely one percent of any gain in the value of the account, was incidental, and plaintiffs point to

no evidence demonstrating that UBS Bahamas intended to compensate DAS or any other party by one percent of the amount of any losses in the account.  Indeed, it defies belief that UBS Bahamas would have ever agreed to such an arrangemet.  Therefore plaintiffs cannot assert claims pursuant to Global's account agreements with UBS Bahamas as third-party beneficiaries, and are not real parties in interest under such a theory.

The Court finds plaintiffs remaining arguments entirely lacking in merit.[7] Therefore, plaintiffs' second, third, fourth, and fifth claims are dismissed because no plaintiff here is the real party in interest for those claims.[8]

## C.  Plaintiffs are the Real Parties in Interest for Plaintiffs' First Claim

Plaintiffs' first claim alleges that the CSA precluded UBS Bahamas from selling any of the Ideiasnet stock held in Global's account as collateral for the Global loan. (SAC ¶¶ 7(c)(iv), 16, 18-19, 21(a), 33.)[9]  Plaintiffs' claim is that UBS Bahamas breached the CSA when it, in fact, sold that stock shortly after executing the CSA.  (*Id*. ¶ 36.)  The improper Ideiasnet sales allegedly decreased the value of the total proceeds of the shares

---

[7] Plaintiffs mention that "an assignee can possess a sufficient interest to be entitled to be heard on the merits."  (Pl.'s Opp'n at 12-13.)  Without judging the merits of this argument, the Court finds that plaintiffs have made no showing that any of them is an assignee of Global's account agreements with UBS Bahamas. Plaintiffs also claim that UBS Bahamas treated them both as the "true owner[s]," of the Global account, (*Id*. at 6), and also as the "beneficial owner[s]" of the account.  (*Id*. at 12.)  Plaintiffs, however, point to no evidence supporting either of these claims.  Plaintiffs cite the Account Application's "No trusts" condition, claiming that that term allows DAS to act as if it were the account's owner.  (*Id*. at 11.)  However, plaintiffs have entirely misread that condition which instead allows *UBS Bahamas* to treat *Global* as the true and full owner of any assets in the Global account, despite *Global* owing a duty regarding those assets to a third party.  (Account Application ¶ 11.)

[8] Rule 17(a)(3) cautions a court to not dismiss an action for failure to prosecute in the name of the real party in interest unless that real party in interest has had a reasonable opportunity to join the suit.  Here, however, should Global join the suit the Court would be divested of subject matter jurisdiction as aliens would exist on both sides of the action.  *CP Solutions*, 553 F.3d at 158.  The Court is therefore comfortable dismissing these claims at this time.

[9] The Court notes that the CSA contains no express term creating that obligation.  As restrictions on UBS Bahamas, the CSA states, *in toto*, "WHEREAS, Aguinaga further agrees that in consideration of the collateralization of UBS' lien and the current non-exercise of its rights pursuant to the terms of any prior agreements with Global or Aguinaga, Aguinaga agrees [to not unduly encumber or sell the real property he was pledging as extra collateral for the Global loan]."  (SAC at 18.)

16

sold by UBS Bahamas in the Ideaisnet tender in November 2009 in that fewer shares were sold.  This in turn decreased both the total proceeds applied to satisfaction of the Global loan and the residual proceeds turned over into Global's account.  (*Id*. ¶¶ 41-42.)  Here, plaintiffs are the real parties in interest.  The CSA was executed between UBS Bahamas on one side, and the Aguinagas and DAS on the other.  (*Id*. at 19.)  Therefore plaintiffs can show that they had a contract with UBS Bahamas, and can allege that they performed, that UBS Bahamas breached, and that they suffered damages.  This is enough to claim an entitlement to enforce rights under the contract.  *See Sundowner Alexandria*, 2010 WL 3238948, at *3.

Though plaintiffs have thus established their status as the real parties in interest, the Court questions (1) the damages plaintiffs claim; and (2) whether any such damages could satisfy 28 U.S.C. § 1332(a)'s amount in controversy requirement.  Plaintiffs claim $479,705 in damages, the difference between the price UBS Bahamas received for the 211,000 Ideiasnet shares in its allegedly improper sales in April 2009, and the price that would have been received had those shares been sold in the November 2009 tender in Brazil.  However, based on plaintiffs' pleadings, it seems those damages, if they exist at all, would not be paid over to any plaintiff here, but instead would flow to Global.  It would have been *Global's* account at UBS Bahamas that was shortchanged.  UBS Bahamas allegedly would have received a greater total return in the November 2009 tender had the previously-sold 211,000 shares been included in that sale; but any extra proceeds would have been first put towards satisfying the Global loan, and second transferred into Global's account.  (SAC ¶¶ 27(b), (c), 29-31.)  Thus it seems that these particular damages are Global's, not plaintiffs'.  In other words, the record is sparse in

setting forth factual material supporting a plausible claim to damages, regardless of any allegations going to the other elements of a breach of contract.  Furthermore, if plaintiffs could claim these damages at all, plaintiffs seem to be limited to one percent of any extra proceeds, namely $4,797.05, far below the more-than $75,000 required by Section 1332(a).  Accordingly, while the Court denies the UBS defendants' motion to dismiss plaintiffs' first claim, that for breach of the CSA, the Court does so without prejudice to move under Rule 12(b)(1), Rule 12(b)(6), or Rule 56 regarding damages or jurisdictional amount.

### D.  Global is not a Required Party Under Rule 19 for Plaintiffs' First Claim

Defendants invoke Federal Rule of Civil Procedure 19, and specifically Rule 19(a)(1)(B)(ii), to argue that Global is a required party "because the failure to include [Global] as a party subjects UBS Bahamas to the substantial risk of incurring double or inconsistent obligations."  (Def.'s Mem. at 7-8.)  Defendants argue this is so because plaintiffs' claims allege that UBS Bahamas breached the terms of the various account agreements it executed with Global on August 9, 2006.  (*Id*. at 8.)  Because those agreements' obligations were owed to Global, Global remains entitled to sue to enforce them.  (*Id*.)  Thus if UBS Bahamas loses to plaintiffs here and again to Global in the theoretical future suit, UBS Bahamas would be paying out twice on the same claim; and if UBS Bahamas wins in the current suit and loses in a later suit against Global, it would then face inconsistent judgments.  (*Id*.)

Rule 19(a)(1)(A) requires the court to join a party if "in that person's absence, the court cannot accord complete relief among existing parties."  Fed. R. Civ. P. 19(a)(1)(A).

In other words, if some current party could not therefore obtain complete relief from its opponent without the participation of the absent party, Rule 19(a)(1)(A) requires joinder of that absent party. *Mastercard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 385 (2d Cir. 2006). Here, plaintiffs' claims can be fulfilled without participation of Global. "If [plaintiffs] prevail[] and [are] granted [their] requested relief, [defendants] will be" forced to satisfy some level or form of liability, and "[t]his will resolve the dispute between [plaintiffs] and [the UBS defendants], and [Global's] presence is unnecessary." *Id.* Indeed, "[a] nonparty to a commercial contract," like the contract in question here, "ordinarily is not a necessary party to an adjudication of rights under the contract." *Peregrine Myanmar Ltd. v. Segal*, 89 F3d 41, 49 (2d Cir. 1996) (citing *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1044 (9th Cir. 1983)). Thus, Global is not required under Rule 19(a)(1)(A).[10]

Rule 19(a)(1)(B)(i) protects an absent party's unclaimed interest in an ongoing litigation; 19(a)(1)(B)(ii) protects parties in litigation from the risk of double or inconsistent obligations should one party find itself in a later litigation with that absent party. *Davidson Well Drilling*, 2009 WL 2135396, at *3-4. However, a party cannot qualify as "required" under either subsection of Rule 19(a)(1)(B) if it does not "*claim*[] *an interest* relating to the subject of the action." Fed. R. Civ. P. 19(a)(1)(B) (emphasis added); *Oneida Indian Nation of New York v. Madison County & Oneida County, New York*, 605 F.3d 149, 162 (2d Cir. 2010). As the Second Circuit and the courts in this district have made clear, "It is *the absent party* that must claim an interest." *Peregrine Myanmar*, 89 F.3d at 49 (emphasis added); *see ConnTech Dev. Co. v. Univ. of*

---

[10] As the UBS defendants have not made any claims against plaintiffs or anyone else, whether they can be accorded complete relief is not an issue.

*Connecticut Educ. Props., Inc.*, 102 F.3d 677, 683 (2d Cir. 1996) ("[Defendant's] self-serving attempts to assert interests on behalf of [the non-party] fall outside the language of Rule 19(a)[(1)(B)], and thus cannot be the basis for [defendant's] necessary party argument."); *Continental Cas. Co. v. Am. Home Assurance Co.*, No. 05 Civ. 7874 (LTS), 2008 WL 1752231, at *4 (S.D.N.Y. Apr. 14, 2008) ("[T]he absent party must be the one claiming the interest.  A party named in the litigation cannot assert the interest on the absent party's behalf.  Here, [the non-party] does not claim an interest in the litigation . . . [and] [d]efendants [sic] attempt to assert the interest on [the non-party's] behalf" is insufficient to make that non-party required); *City of New York v. Milhelm Attea & Bros., Inc.*, 550 F. Supp. 2d 332, 353 (E.D.N.Y. 2008) ("because no [non-party] has claimed an interest relating to the subject of the action, they are not required to be joined under either prong of Rule 19(a)[(1)(B)].") (internal quotation marks omitted). Though the non-party need not actively intervene in the present litigation, it must at least manifest some legal claim in the subject matter of the action.  *See*, *e.g.*, *Davidson Well Drilling*, 2009 WL 2135396, at *2, *5-6 (non-party to New York litigation had instituted its own separate claim in Puerto Rico, based on the same contract at issue in the New York action; the court found that non-party required under Rule 19(a)(1)(B)(i) and (ii) in the New York action, and dismissed the case under Rule 19(b)).  Indeed, merely being able to claim an interest is insufficient for Rule 19(a)(1)(B) purposes. *Faith Temple Church v. Town of Brighton, New York*, No 04-CV-6355L, 2005 WL 66210, at *5 (W.D.N.Y. Jan. 12, 2005) ("[I]t does not appear that [the non-party] actually 'claims an interest' relating to the subject matter of this action.  He certainly seems to *have* an interest, but that is not enough, and [defendant] cannot assert an interest on his behalf.")

(emphasis in original).  In the case at bar the absent party, Global, has neither claimed any interest in this litigation nor, it seems, claimed any interest anywhere related to any of its contracts with UBS Bahamas, the subject matter of this litigation.  Therefore Global is not a "required" party under Rule 19(a)(1)(B)(i) or (ii).

Because the Court has determined that Global is not required under Rule 19(a) it need not proceed to consider whether the action should be dismissed under Rule 19(b).  *Mastercard*, 471 F.3d at 389.

### E.  The Bahamas is not the Exclusive Forum for Plaintiffs' First Claim

Defendants' final argument for dismissal is that The Bahamas is the exclusive forum for any disputes relating to UBS Bahamas's handling of the Global account due to the forum-selection clauses in each agreement executed between it and Global.  (Def.'s Mem. at 10.)  However, as plaintiffs' only remaining claim is their first, alleging breach of the CSA, defendants' argument fails.  Even if the account agreements make The Bahamas the forum for any dispute arising from them, the CSA states that "the parties consent to the jurisdiction of the Courts of the State of New York."  (SAC at 19.)  Because district courts are instructed to give effect to parties forum-selection clauses when valid, *Yakin v. Tyler Hill Corp.*, 566 F.3d 72, 76 (2d Cir. 2009), and because defendants have made no argument that the CSA's forum-selection clause is invalid, the Court denies defendants' argument to dismiss based on the account agreements' forum-selection clauses as that argument applies to plaintiffs' first claim.

## III. CONCLUSION

For the reasons stated above, defendants' motion to dismiss is GRANTED in part, and plaintiffs' second, third, fourth, and fifth claims are dismissed; and defendants' motion to dismiss is DENIED in part without prejudice to move under Rules 12(b)(1), 12(b)(6), or 56.  The Clerk of the Court is directed to close this motion [37].

SO ORDERED.

Dated: New York, New York
December 14, 2010

Richard J. Holwell
United States District Judge

22